1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10

11  RUBY JANET A.,[1]                        Case No.:  24cv180-LR
12                          Plaintiff,       **ORDER DENYING PLAINTIFF'S**
13  v.                                       **MERIT BRIEF**
14  LELAND DUDEK,                            **[ECF NO. 11]**
    Acting Commissioner of Social Security,[2]
15
16                          Defendant.
17

18          On January 26, 2024, Ruby Janet A. ("Plaintiff") filed a Complaint pursuant to

19  42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social

20  Security ("Defendant" or "Commissioner") denying Plaintiff's application for a period of

21

22  _____

23

24  [1]  Pursuant to Civil Local Rule 7.1(e)(6)(b), the Court's opinions in Social Security cases filed under
    42 U.S.C. § 405(g) "refer to any non-government parties by using only their first name and last initial."

25
    [2]  Plaintiff named Martin O'Malley, who was the Commissioner of Social Security when Plaintiff filed
26  her Complaint on January 26, 2024, as a Defendant in this action.  (See ECF No. 1 at 1.)  Leland Dudek
    is now the Acting Commissioner of Social Security Administration, and he is automatically substituted
27  as a party pursuant to Federal Rule of Civil Procedure 25(d).

28

disability and disability insurance benefits.  (ECF No. 1.)  The parties consented to Magistrate Judge jurisdiction.  (ECF No. 13.)

Now pending before the Court is Plaintiff's Opening Brief, claiming error by the Administrative Law Judge ("ALJ") who conducted the administrative hearing and issued the decision denying Plaintiff's application for disability insurance benefits.  (ECF No. 11.)  The Court has carefully reviewed the Complaint [ECF No. 1], the Administrative Record [ECF No. 7], Plaintiff's Opening Brief [ECF No. 11], Commissioner's Responsive Brief [ECF No. 14], and Plaintiff's Reply [ECF No. 15].  For the reasons discussed below, the final decision of the Commissioner is **AFFIRMED**.

## I.  PROCEDURAL BACKGROUND

On June 11, 2021, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning on March 18, 2021.  (ECF No. 7 ("AR") at 167–74, 201–11.)  After her application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing before an ALJ.  (Id. at 108–09.)  An administrative hearing was held on December 5, 2022.  (Id. at 36–55.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a vocational expert ("VE").  (Id.)

On January 17, 2023, the ALJ issued a written decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 18, 2021, the alleged onset date, through the date of the ALJ's decision.  (Id. at 30.)  The ALJ's decision became the final decision of the Commissioner on December 1, 2023, when the appeals council denied Plaintiff's request for review.  (Id. at 1–6.)  This timely civil action followed.  (See ECF No. 1.)

## II.  SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the Commissioner's five-step sequential evaluation process.  See 20 C.F.R. § 404.1520.  (AR at 18–30.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of March 18, 2021, through the date of the ALJ's decision.  (Id. at 21.)  At step two, the ALJ determined that

Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, fibromyalgia,[3] polyarthralgia,[4] bilateral plantar fasciitis,[5] and chronic intractable migraine without aura.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 22.)

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) except that she can climb ramps and stairs frequently but can never climb ladders, ropes, or scaffolds.  She can stoop, kneel, or crouch frequently.  She can crawl occasionally.  She must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. She must avoid concentrated exposure to hazards.  She should not work at unprotected heights or around dangerous machinery.

(Id. at 25.)

At step four, the ALJ determined that Plaintiff could perform her past relevant work as an operations director.  (Id. at 29.)  The ALJ then found that Plaintiff was not disabled from March 18, 2021, through the date of the ALJ's decision.  (Id. at 30.)

---

[3]  Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue."  Revels, 874 F.3d at 656 (quoting Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004)).  Fibromyalgia symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue."  Id.

[4]  Polyarthralgia refers to pain in two or more joints.  Mangat v. Astrue, Civil No. 11–cv–02579–WQH (BGS), 2013 WL 1386296, at *3 (S.D. Cal. Jan. 2, 2013).

[5]  "Plantar fasciitis is one of the most common causes of heel pain.  It involves inflammation of a thick band of tissue that runs across the bottom of each foot and connects the heel bone to the toes, known as the plantar fascia."  https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/symptoms-causes/syc-20354846 (last visited Mar. 7, 2025).

### III.  DISPUTED ISSUE

In her Opening Brief, Plaintiff raises the following issue as ground for reversal: the "ALJ failed to articulate specific clear, and convincing reason in rejecting [Plaintiff's] testimony."  (ECF No. 11.)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [the court's] judgment for that of the ALJ."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The Court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely."  Revels, 874 F.3d at 654 (internal quotation omitted).

### V.  DISCUSSION

**A.    Parties' Arguments**

Plaintiff argues that the ALJ failed to offer specific, clear, and convincing reasons to discount her subjective symptom testimony.  (See ECF No. 11 at 3–11; ECF No. 15 at 2–6.)  Plaintiff asserts that the ALJ improperly concluded that objective medical evidence

and other evidence in the record did not support Plaintiff's subjective symptom testimony, because the ALJ's reasoning was "too vague." (ECF No. 11 at 7; see also id. n.4.) Plaintiff further contends that the ALJ improperly concluded that Plaintiff's treatment was conservative, because she required surgical treatment,[6] received epidural injections and medial branch blocs, and the ALJ did not demonstrate that there was a more appropriate treatment for her fibromyalgia and migraines. (Id. at 9–11.) Plaintiff also maintains that the ALJ improperly concluded that Plaintiff improved with treatment because she continued to suffer from low back and bilateral foot pain, had tingling in her hands and feet, headaches three-to-four times per month, and difficulties with opening jars. (ECF No. 15 at 2–4.) Plaintiff also states that, contrary to Defendant's assertions, the ALJ did not articulate that he was rejecting Plaintiff's subjective symptom testimony based on prior administrative findings, and did not specify which of Plaintiff's complaints were contradicted by those findings. (ECF No. 11 at 4–5.) Plaintiff therefore maintains that the ALJ erred, and asks the Court to reverse and remand for the payment of benefits, or, in the alternative, to remand the case for further proceedings. (See id. at 11–12; ECF No. 15 at 1, 6.)

Defendant responds that substantial evidence supported the ALJ's decision to discount Plaintiff's subjective symptom testimony. (ECF No. 14 at 6–14.) In support, Defendant states that Plaintiff reported to her medical care providers significant improvement with treatment, that she routinely exercised, drove, performed activities of daily living, and did not require assistance with self-care. (Id. at 8–10.) Defendant further asserts that Plaintiff's subjective complaints were inconsistent with the medical evidence in the record, which contained numerous examination findings of intact motor strength and other findings that were within the norm. (Id. at 10–14.) Defendant also maintains that Plaintiff's treatment was conservative, as evidenced by her doctor's

---

[6] In her Reply, Plaintiff acknowledges that the surgery predated her alleged onset date at issue in this case. (ECF No. 15 at 4.)

characterization of the treatment, and because her "treatment regimen of pain medication, physical therapy, and limited injections [wa]s also consistent with the type of treatment that ha[s] been classified as conservative." (Id. at 12.)  Further, Defendant argues that the ALJ considered prior administrative findings of State agency medical consultants, Dr. Schutt-Kinnear and Dr. Christian, who opined that Plaintiff could perform light work. (Id. at 14–15.)  Defendant therefore asks the Court to affirm the Commissioner's decision, or, in the alternative, to remand for further proceedings.  (Id. at 15–17.)

## B.    Applicable Law

The Ninth Circuit has established a two-part test for evaluating a claimant's allegations regarding subjective symptoms.  See Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017); see also Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged." Trevizo, 871 F.3d at 678 (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)).  Second, if a claimant presented such evidence, and there is no evidence of malingering, the ALJ may reject the claimant's statements about the severity of the claimant's symptoms "only by offering specific, clear and convincing reasons for doing so." Id.

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015).  "[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." Id. at 489.  Instead, the ALJ must identify the testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain what evidence undermines the claimant's testimony.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citing Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014)); see also Burrell v. Colvin, 775 F.3d 1133, 1139 (9th Cir. 2014) (finding error where the ALJ "never connected the medical record" to the

claimant's testimony, and did not make "a specific finding linking a lack of medical records to [the claimant's] testimony about the intensity" of her symptoms); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (providing that the ALJ's reasons for discounting a claimant's testimony must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony").

"Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about symptoms, evidence from medical sources, and observations by the Agency's employees and other individuals.  See 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029.  In addition, the ALJ may consider other factors, such as the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain.  See 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029.

## C.    Testimony During Plaintiff's December 5, 2022 Administrative Hearing

Plaintiff testified that she could not lift more than a gallon of milk with her right hand, and lifting with both hands was difficult.  (AR at 40.)  She further stated that she could sit for about thirty minutes, stand for five-to-ten minutes, and walk for ten-to-fifteen minutes on a "good day."  (Id.)  Plaintiff also had difficulties with bending down and getting back up, and needed to take a nap during the day due to fatigue.  (Id. at 40–41.)

Further, Plaintiff testified that she experienced migraine headaches and had approximately twenty migraines per month.  (Id. at 41.)  When she had a migraine, she took her medication and had to lie down in a dark and quiet room, sometimes for the remainder of the day.  (Id.)  She had "severe" migraines—the migraines that lasted all day—once a week.  (Id.)

When the ALJ asked Plaintiff whether her medications were "helping" her, Plaintiff responded as follows:

> Yeah, the medicine is helping me and that's why I say sometimes it's just like two hours I lay down and then it goes away.  So that's why I say they're 20 per month, but the severe ones are not as frequently.  Before it used to be I'd get three or four that would give me—lay me in bed the whole day.  Now, because of the . . . medication, it's a helper.  It's only like a few hours and I'm able to get up again.

(Id.)

Plaintiff further testified that she struggled with household chores.  (Id. at 42.)  She explained that when she cooked, she had to pause and rest before resuming cooking.  (Id.)  Plaintiff also stated that cleaning required bending down, which "thr[ew] out [her] back," and she had to "pay someone to clean [her] house."  (Id. at 43.)

Additionally, Plaintiff testified that she had problems with overhead reaching due to neck and arm problems, as well as with brushing her hair because her arms and hands hurt.  (Id.)  Plaintiff was not able to look down when typing for more than three-to-four minutes and to use a computer for more than five-to-ten minutes, had to stop due to pain in her hands, but was able to resume typing after about a fifteen minute break.  (Id. at 44–46.)  Writing was "worse" than typing, she experienced ongoing weakness in both hands, but her right hand was worse than her left hand.  (Id.)  Plaintiff also had difficulties with opening jars due to hand problems, and "ha[d] to get someone to open [the jars] for [her]."  (Id. at 45–46.)

Concerning her past work, Plaintiff testified that she worked as a "center director" at Jenny Craig from 2012, until 2021.  (Id. at 48.)  She called customers, sold food, counseled customers regarding their eating habits, and did marketing, which entailed "walking around different businesses to try to work with them."  (Id. at 48–49.)  Once a week, Plaintiff had a meeting with her staff, during which she trained the staff, and did their write-ups and paperwork.  (Id.)  Additionally, once a month, Plaintiff had a meeting

24cv180-LR

with other managers.  (Id.)  Plaintiff stated that it was "very difficult" for her to work because she "was in extreme pain every day." (Id. at 47.)

### D.    Plaintiff's Exertion Questionnaire

On October 10, 2021, Plaintiff filled out an "Exertion Questionnaire." (Id. at 247–49.)  She stated that every day she woke up with fatigue and pain in her feet, and her medicine made her sleepy.  (Id. at 247.)  Further, she stated that fibromyalgia made her muscles weak, and daily headaches made her feel like a "zombie." (Id.)  She cooked every day, but it made her weak; she was able to wipe kitchen counters and do dishes, but could not do many other house chores because she was "always sleepy." (Id.)

Plaintiff also stated that her feet got "hot" and hurt when she walked more than ten minutes, and she could only stand for five minutes without pain.  (Id.)  She could climb one flight of stairs because her legs felt weak and she was short of breath.  (Id. at 248.)  Plaintiff could lift a "small load of clothes," was able to carry between two and nine pounds, but tried not to lift anything since it "flared up" her back and knees.  (Id.)

Plaintiff further stated that on some days, she was able to drive a car for about an hour, but on other days, she was not able to drive at all.  (Id.)  She did yard work, including watering fruit trees and plants, twice a week for ten minutes.  (Id.)  When Plaintiff was cooking, she had to "prep and stop," wait for fifteen minutes, and then resume cooking.  (Id.)  She had to use a stool when she was cooking and washing dishes. (Id.)

Plaintiff reported sleeping between five and eight hours per night, and stated that she napped throughout the day for about thirty minutes.  (Id.)  She was using a cane on days when her knees were "buckling or having muscle weakness," and a wheelchair when she had to go to a place that required "a lot of walking," like stores.  (Id.)  Plaintiff also stated that she had problems with concentration and memory, could not multitask because she forgot what she was doing, and had "problems speaking." (Id.)

/ / /

/ / /

24cv180-LR

**E.    Analysis**

The parties do not dispute the ALJ's finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (Id. at 25; see also ECF Nos. 11, 14, 15.)  Accordingly, the first prong of the ALJ's inquiry regarding Plaintiff's subjective symptoms is satisfied.

Turning to the second prong of the ALJ's inquiry, neither party alleges that the ALJ found that Plaintiff was malingering.  (See ECF Nos. 11, 14, 15.)  The Court therefore is required to determine whether the ALJ identified which of Plaintiff's subjective allegations of impairment he discounted, and whether the ALJ provided specific, clear, and convincing reasons for doing so.  See Brown-Hunter, 806 F.3d at 489; Lambert, 980 F.3d at 1277.

The ALJ summarized Plaintiff's testimony as follows:

> In a function report, the claimant stated that she could not stand or walk for prolonged periods.  She stated further that she had difficulty climbing stairs, lifting and/or carrying more than nine pounds, and she reported difficulty with housework.  Further, she alleged that she used an assistive device at times (See Exhibit 8E).  At the hearing, she testified that she could sit for thirty minutes; stand for ten minutes; and walk for up to fifteen minutes at a time.  She alleged that she could not lift over one pound.  She stated further that she experienced frequent migraines.  Additionally, she alleged difficulty using her hands (See Hearing testimony).

(AR at 25.)

The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record."  (Id.)  The ALJ then discounted Plaintiff's subjective symptom testimony citing the following reasons: (1) Plaintiff reported significant improvement of her symptoms with treatment, (2) Plaintiff's treatment was conservative, and (3) objective medical evidence contradicted Plaintiff's symptom allegations.  (Id. at 27–28.)

Although Defendant cites an additional reason to support the ALJ's decision to discount Plaintiff's subjective symptom testimony—that the ALJ cited prior administrative findings of State agency medical consultants, Dr. Schutt-Kinnear and Dr. Christian, who opined that Plaintiff could perform light work, (ECF No. 14 at 14–15), the Court can only assess the reasoning the ALJ provided in his decision.  See Revels, 874 F.3d at 654 (stating that a court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely"); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.").  As Plaintiff correctly notes, the ALJ did not specifically cite State agency's medical consultant's opinions as a reason to discount Plaintiff's testimony regarding her symptoms.  (See ECF No. 15 at 4; AR at 25–28.)  The Court will therefore examine the ALJ's stated reasons for discontinuing Plaintiff's testimony.

### 1. Improvement of symptoms with treatment

The ALJ discounted Plaintiff's subjective symptom testimony because Plaintiff "reported significant improvement of her symptoms with treatment despite her alleged level of pain and limitations."  (AR at 26 (citing id. at 372, 478, 515, 582, 731, 1028–31).)  In assessing a claimant's subjective symptoms, an ALJ may properly consider the "type, dosage, effectiveness, and side effects of any medication taken to alleviate pain," as well as "treatment, other than medication" the claimant receives or has received to relieve "pain or other symptoms."  See 20 C.F.R. § 404.1529(c)(3)(iv)–(v); see also Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) (stating that "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability"); Warre v. Comm'r Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

In discussing Plaintiff's improvement with treatment, the ALJ cited a progress note from Plaintiff's April 10, 2020 follow-up appointment with her neurosurgeon, Dr. Vikram Udani, after Plaintiff's C4–6 artificial disc replacement surgery on August 7, 2019.  (AR at 26 (citing id. at 372–73).)  Plaintiff reported that "her neck pain ha[d] significantly improved since [her] surgery."  (Id. at 372.)  She also reported numbness and tingling in her hands, low back pain that was exacerbated when she was bending, bilateral foot tingling, and "difficulty opening jars," but denied lower extremity weakness.  (Id.)  Dr. Udani noted that Plaintiff's MRI of the lumbar spine showed no evidence of nerve impingement, Plaintiff had right intrinsics weakness and diminished sensation in her right hand, but was "otherwise neurologically intact."  (Id.)  Dr. Udani specifically noted in his treatment plan that Plaintiff should "[c]ontinue conservative treatment."  (Id.)

Next, the ALJ cited records dated January 19, 2021, documenting Plaintiff's reports to her rheumatologist, Dr. Jefferey Chwa, that she had been doing "very well," and that she denied any recent fibromyalgia flare ups, stiffness or swelling.  (Id. at 26 (citing id. at 478, 731).)  Plaintiff also reported "mild fatigue," but stated that her prescribed medication "helped with her neck and shoulder pain."  (Id. at 478, 731.)  Additionally, Plaintiff reported tingling in her feet and hands, but stated that she was able to complete her daily activities.  (Id.)

Further, the ALJ cited notes from a neurologist, Dr. Roberto Gratianne, dated August 7, 2021.  (Id. at 26 (citing id. at 515).)  Dr. Gratianne noted that Plaintiff was referred to him for neurological evaluation and treatment of migraine headaches.  (Id. at 515.)  Plaintiff reported that she was "[d]oing well," experienced about two headaches per month, and had a "[g]ood response to Imitrex."  (Id.)  Plaintiff also reported "problems with word finding" and short term memory, but stated that she was "[d]oing self care," and was able to drive and engage in activities of daily living.  (Id.)

The ALJ also cited Dr. Gratianne's notes from Plaintiff's follow-up appointment on October 19, 2021.  (Id. at 26 (citing id. at 582).)  The notes listed the same findings as Dr. Gratiano's August 7, 2021 appointment notes.  (See id. at 582; see also id. at 515.)

Finally, the ALJ cited notes from Plaintiff's rheumatology appointment with Dr. Puja Chitkara on September 21, 2022.  (Id. at 26 (citing id. at 1028–31).)  Dr. Chitkara wrote that Plaintiff's fibromyalgia had been "stable since last visit with no significant flares."  (Id. at 1029.)  Plaintiff denied any joint swelling or stiffness, reported "occasional lower back and leg pain mostly aggravated by prolonged mechanical activities," and stated that she used a roller foam to help stretch her back, which "help[ed]."  (Id.)  Plaintiff also reported that she no longer had tingling in her hands, and no joint pain, that she engaged in routine exercises, including Pilates and riding a stationary bike, and wanted to restart aqua therapy.  (Id. at 1028, 1030.)  Dr. Chitkara noted that Plaintiff "continue[d] with current Tizanidine[7] [prescription] with no issues."  (Id.)

The Court has carefully reviewed the medical records cited by the ALJ and notes that although some of those records predated Plaintiff's alleged onset date of March 18, 2021, they documented Plaintiff's reports to her neurosurgeon of significant improvement in her neck and shoulder pain after her disc replacement surgery on August 7, 2019.  (See id. at 26, 372–73.)  Notably, Plaintiff's records dated after her alleged onset date also document her reports to her pain management physician of improvement in symptoms after cervical and lumbar epidural steroid injections.  (See, e.g., id. at 302 (containing March 22, 2021 appointment notes that Plaintiff's cervical epidural steroid injection "gave her pain relief" and that she wanted to repeat it because "she ha[d]

---

[7]  Tizanidine is a skeletal muscle relaxant used to relieve muscle spasms and increased muscle tone.  See Barber v. Colvin, No. EDCV 12–1914–JPR, 2014 WL 103230, at *6 (C.D. Cal. Jan. 9, 2014); Terrazas v. Astrue, No. 1:10–cv–00113–SMS, 2011 WL 1239814, at *4 (E.D. Cal. Mar. 29, 2011).

24cv180-LR

therapeutic benefits from [it] in the past"); id. at 306 (containing April 13, 2021 appointment notes documenting Plaintiff's report that her cervical epidural steroid injection was "very successful [in] helping with her neck pain"); id. at 309 (containing May 18, 2021 appointment notes that Plaintiff reported that her lumbar epidural steroid injection was "successful").) Additionally, the ALJ also cited numerous records from Plaintiff's neurologist and rheumatologist documenting Plaintiff's good response to medications for migraines and fibromyalgia, which supported the ALJ's conclusion that Plaintiff's symptoms improved with treatment. (See id. at 26, 515, 582, 731, 1028–31.)

Accordingly, the ALJ identified specific statements Plaintiff made regarding her symptoms that the ALJ discounted, and cited voluminous medical records documenting Plaintiff's reports of improvement of her symptoms with treatment. (See id. at 25–26.) The Court therefore finds that the ALJ provided a specific, clear, and convincing reason, supported by substantial evidence in the record, to discount Plaintiff's testimony regarding her symptoms. See Guthrie v. Kijakazi, No. 21-36023, 2022 WL 15761380, at *1 (9th Cir. 2022) (finding that the ALJ reasonably relied on evidence of improvement with treatment to discount a claimant's symptom allegations; reasoning that the ALJ provided specific, clear and convincing reason for discounting the claimant's symptom testimony); Bowen v. Kijakazi, No. 21-35600, 2022 WL 2610242, at *1 (9th Cir. 2022) (concluding that the ALJ properly discounted a claimant's testimony about her limitations and symptoms, where the claimant told her medical care providers that she was "[d]oing extremely well" and had "no complaints" after her surgery).

## 2. Conservative treatment

The ALJ also discounted Plaintiff's subjective symptom testimony after concluding that Plaintiff's treatment was conservative. (AR at 26–28). Specifically, the ALJ noted that Plaintiff's degenerative disk disease was treated with pain medications and "no surgical intervention was indicated" for this condition, and that Plaintiff's fibromyalgia and polyarthralgia were treated with muscle relaxants. (Id. at 26–27 (citing id. at 481, 536–43, 653–56, 734–39, 908, 936, 959–60, 994–1002, 1028–31, 1038).) The

24cv180-LR

ALJ also noted that Plaintiff's bilateral plantar fasciitis was treated with physical therapy and custom shoes, and her migraines—with medication and Botox. (Id. at 27–28 (citing id. at 431–33, 466–67, 469, 515–17, 582–83, 959, 994–1002, 1028–31, 1040).)

The treatment a claimant seeks and receives is an important indicator of the intensity and persistence of the claimant's symptoms. See 20 C.F.R. § 404.1529(c)(3). Evidence of conservative treatment is sufficient to discount a claimant's testimony regarding the severity of the claimant's impairment. See Tommasetti v. Astrue, 533 F.3d 1035, 1039–40 (9th Cir. 2008); Parra v. Astrue, 481 F.3d 742, 750–51 (9th Cir. 2007). Nevertheless, conservative treatment is not a proper basis for discounting a claimant's symptom allegations where there is no indication that more aggressive treatment options are appropriate or available. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008); Lapeirre–Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010).

Medical records in this case indicate that in August 2019, Plaintiff had a C4–C5 and C5–C6 anterior cervical diskectomy with artificial disk replacement, partial corpectomies of C4, C5, and C6, as well as placement of intervertebral biomechanical devices at C4–C5 and C5–C6. (AR at 932–33.) Although the surgery predated Plaintiff's alleged onset date, the records indicate that after the alleged onset date, Plaintiff was treated with epidural injections and medial branch blocks, which are not considered conservative treatments. (See, e.g., id. at 290, 304, 308); see also Shelley S. v. O'Malley, Case No.: 22cv1499-LR, 2024 WL 460236, at *10 n.12 (S.D. Cal. Feb. 6, 2024) (finding that treatment with epidural steroid injections and narcotic pain medications was not conservative); Christie v. Astrue, No. CV 13–08307–VBK, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (noting that plaintiff's treatment of degenerative disc disease was not conservative, where she tried "narcotic pain medication, steroid injections, trigger point injections, epidural shots, and cervical traction"); Huerta v. Astrue, No. EDCV 07-1617-RC, 2009 WL 2241797, at *4 (C.D. Cal. July 22, 2009) (finding that treatment that included epidural steroid injections was

not conservative); <u>Yang v. Barnhart</u>, No. ED CV 04-958-PJW, 2006 WL 3694857, at *4 (C.D. Cal. Dec. 12, 2006) (finding that treatment, which consisted of epidural injections, physical therapy, and pain medications, was not conservative).

Although Defendant attempts to demonstrate that Plaintiff's treatment was conservative by citing her neurosurgeon's, Dr. Udani's, description of Plaintiff's treatment as conservative, (<u>see</u> ECF No. 14 at 2), Dr. Udani's records clarify that after Plaintiff's surgery, he was recommending managing Plaintiff's condition without surgical intervention, (<u>see</u> AR at 362–63, 372, 936). Notably, Plaintiff's medical records also contain appointment notes from her pain management physician, Dr. Verdolin, who treated Plaintiff after her surgery by administering cervical and lumbar epidural steroid injections. (See <u>id.</u> at 303–06, 307–09.)

As for Plaintiff's polyarthralgia, fibromyalgia, and bilateral plantar fasciitis, the records the ALJ cited establish that those conditions were treated with medications, including muscle relaxants, physical therapy, and custom shoes, which represent treatments that courts have characterized as conservative. See <u>Hanes v. Colvin</u>, 651 F. App'x 703, 705 (9th Cir. 2016) (concluding that the claimant's treatment, which "consisted primarily of minimal medication, limited injections, physical therapy, and gentle exercise" was conservative); <u>Tommasetti</u>, 533 F.3d at 1040 (concluding that the claimant's treatment, which consisted of physical therapy, anti-inflammatory medication, transcutaneous electrical nerve stimulation unit, and lumbosacral corset, was conservative); <u>Marshall v. Berryhill</u>, Case No. 16-cv-00666-BAS-PCL, 2017 WL 2060658, at *14 (S.D. Cal. May 12, 2017) (concluding that the claimant's treatment, which consisted of taking prescribed medications and receiving trigger steroid injections for fibromyalgia, was conservative). With respect to Plaintiff's migraine headaches, in addition to taking prescribed medications, she was also referred for Botox injections, which courts have also characterized as a conservative form of treatment. See <u>Oscar K. v. Kijakazi</u>, Case No.: 3:20-cv-00673-LAB-RBM, 2022 WL 141102, at *8 (S.D. Cal. Jan. 14, 2022) (noting that "Botox injections have been considered a conservative form of

treatment"); <u>Marshall</u>, 2017 WL 2060658, at *14 (concluding that the claimant's treatment for migraines, which included Botox injections, was conservative).

Nevertheless, an ALJ's reliance on conservative treatment is not a proper basis for discounting a claimant's symptom allegations where there is no indication that more aggressive treatment options are appropriate or available.  <u>See Carmickle</u>, 533 F.3d at 1162 (9th Cir. 2008); <u>Lapeirre–Gutt</u>, 382 F. App'x at 664.  The record in this case does not contain any indications that Plaintiff's physicians proposed a more aggressive course of treatment for polyarthralgia, fibromyalgia, bilateral plantar fasciitis, and migraines that Plaintiff declined to pursue, and the ALJ did not suggest that another course of treatment was available.  <u>See Moon v. Colvin</u>, 139 F. Supp. 3d 1211, 1220 (9th Cir. 2015) ("[T]he fact that treatment may be routine or conservative is not a basis for finding subjective symptom testimony unreliable absent discussion of the additional, more aggressive treatment options the ALJ believes are available."); <u>Cindy F. v. Berryhill</u>, 367 F. Supp. 3d 1195, 1210 (D. Or. 2019) (quoting <u>Lapeirre-Gutt</u>, 382 F. App'x at 664) ("Because the ALJ did not specify what 'more aggressive treatment options [were] appropriate or available,' it would be illogical to discredit Plaintiff 'for failing to pursue non-conservative treatment options where none exist.'"); <u>see also</u> <u>Marshall</u>, 2017 WL 2060658, at *14 (finding that the ALJ's decision to discount a claimant's symptom testimony because the claimant's treatment was conservative was not supported by substantial evidence, where there was "no indication that a more aggressive treatment [regimen] was available"); <u>Christie</u>, 2011 WL 4368189, at *4 (finding that the ALJ's determination that the claimant's treatment of fibromyalgia was conservative was not supported by substantial evidence, where "it appear[ed] from the record that pain management was the only course recommended by her doctors.").  As such, the ALJ's determination that Plaintiff's treatment was conservative was not supported by substantial evidence in the record.  Therefore, conservative treatment was not a specific and legitimate reason to discount Plaintiff's testimony regarding her symptoms.

///

### 3. Objective evidence

The last reason the ALJ cited to discount Plaintiff's testimony regarding her symptoms was that "the objective medical evidence" contradicted Plaintiff's allegations. (See AR at 25–28.) The ALJ cited numerous examination findings throughout Plaintiff's medical records that were within the norm. (See id.) Specifically, with respect to Plaintiff's degenerative disc disease of the cervical and lumbar spine, the ALJ stated the following:

> The claimant's treatment notes show that she underwent an anterior cervical diskectomy for cervical disc herniation in August 2019 (See Exhibit 23F/26–28). Subsequent treatment notes show that her neck pain improved significantly following the surgical treatment (See Exhibits 3F; 4F/7). An MRI of the cervical spine performed in February 2020 showed moderate neuroforaminal narrowing at the C7–T1 level on the right and T2–3 level bilaterally (Exhibits 10F/29; 19F/160). At a visit for complaints of back pain in April 2020, she had negative straight leg tests. It was noted at the time that her lumbar spine MRI showed a mild degenerative disc disease. She was assessed to be neurologically intact and advised to continue conservative treatment (Exhibit 23F/30–31). In September 2020, she had pain with cervical and lumbar Facet loading tests. She was scheduled for lumbar medial branch block (Exhibit 1F/1–3).
>
> An MRI of the cervical spine performed in February 2021 showed mild to moderate disc degeneration and severe neuroforaminal narrowing at the C6–7 level on the right and moderate neuroforaminal narrowing at the T1–2 level on the right (Exhibit 23F/21–22). A physical examination at the time revealed 5/5 motor strength in the bilateral upper extremities and intact sensation. She was advised to continue pain management. It was noted at the time that no surgical intervention was indicated for her cervical disc disease (Exhibit 3F/11–12). At a visit in December 2021, she exhibited normal range of motion of the neck. Further, she demonstrated 5/5 motor strength and normal gait upon a neurological examination (Exhibit 24F/11–12). EMG and nerve conduction studies performed in March 2022 showed normal findings without evidence of lumbar radiculopathy or large fiber polyneuropathy in the right lower extremity (Exhibits 24F/4; 25F/11–12, 32–33). An MRI of the cervical spine performed at the time showed multilevel degenerative changes with moderate right paracentral disc osteophyte complex involving moderate bilateral uncovertebral joint hypertrophy, moderate canal stenosis, and moderate to severe right-sided

18

foraminal stenosis at the C6–7 level, mild central disc osteophyte complex and mild bilateral foraminal stenosis at the C3–4 level, and metal artifact at the C4–5 and C5–6 levels (Exhibit 23F/16). At a visit in May 2022, she demonstrated 5/5 motor strength [sic] in the bilateral upper extremities (Exhibit 23F/2–3). More recently, at a visit in August 2022, she demonstrated antalgic gait but 5/5 motor strength in the extremities (Exhibit 25F/8–16).

. . . .

[S]he had 5/5 motor strength in the bilateral upper and extremities, intact sensation, and generally normal gait. Furthermore, she had negative straight leg tests.

(Id. at 26 (emphasis added).)

Further, with respect to Plaintiff's polyarthralgia and fibromyalgia, the ALJ noted that:

At a visit in October 2020, she had diffuse tenderness upon a musculoskeletal examination. However, she had no focal deficits, and she exhibited normal range of motion of all joints (Exhibit 19F/129–134). It was noted at the time that her rheumatology bloodwork findings were negative (See Exhibit 10F/11). At a follow up visit in September 2021, her rheumatology panel was negative. She had a normal examination of the joints with full range of motion of all joints and no synovitis (Exhibit 14F/3–10). Subsequent treatment notes show that she continued to have similar findings on exams and negative rheumatology panel (See Exhibits 19F/48–51; 26F/11). More recently, at a visit in September 2022, she reported that she was stable and denied any joint swelling or stiffness. She had a normal examination of the joints with full range of motion of all joints with no synovitis (Exhibit 26F/1–4).

. . . .

[S]he retained normal range of motion of all joints and did not have synovitis. Furthermore, she had negative rheumatology panel.

(Id. at 27 (emphasis added).)

The ALJ next addressed Plaintiff's bilateral plantar fasciitis, stating the following:

The claimant's treatment notes show that her ultrasound of the bilateral feet showed deep fascia plantar fibromatosis, small Achilles' traction spur and

cortical irregularities of the navicular joint of the right foot and Achilles traction spur and a small ganglion cyst of the MTP joint of the left foot (See Exhibits 19F/48, 90; 26F/1). X-rays of the bilateral ankles showed right sided plantar and Achilles calcaneal spur (Exhibits 10F/11; 19F/128). At a visit in March 2021, she exhibited tenderness to palpation of the infra-calcaneal bilaterally. However, she did not have palpable lumps or nodules, defects, edema, erythema, or increased temperature. She was advised to use over the counter arch support (Exhibit 8F/3). At a visit in July 2021, she exhibited mild tenderness to palpation on the plantar medial aspect the heel, but she did not have redness, swelling, increased local temperature, loss of function, or joint motion. She was advised custom foot orthoses, which was noted [to] be unnecessary at the time (Exhibits 8F/2; 9F/2).

. . . .

She retained normal range of motion of the joints of the bilateral feet.

(Id. (emphasis added).)

Finally, with respect to Plaintiff's migraine headaches, the ALJ noted the following:

In March 2021, it was noted that her migraine headache was stable with treatment (Exhibit 6F/4–6). In August and October 2021, it was note[d] that the claimant was having two headaches per month. However, it was also noted that she had good response to treatment and that she was doing well. Further, she had normal findings upon neurological examinations at the time. Accordingly, she was advised to continue her treatment regimen (Exhibits 12F/2–4; 17F/2–3). At a visit in December 2021, it was noted that she had good response to treatment, and she was advised to continue her treatment regimen (Exhibit 24F/11). More recently, at a visit in August 2022, she reported more frequent headaches. On exam, she had a negative Romberg test. She was referred for Botox treatment due to her reports of more frequent headaches (Exhibit 25F/8–16).

. . . .

[S]he had normal neurological examination findings with negative Romberg tests.

(Id. at 28 (emphasis added).)

Although "subjective pain is not always verifiable through a physical examination," Glanden v. Kijakazi, 86 F.4th 838, 847 (9th Cir. 2023), "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony," Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir. 2022).  "The Ninth Circuit has found that evidence documenting intact limb strength demonstrates greater functionality than claimed."  Peters v. Comm'r of Soc. Sec., No. 2:23-cv-01924 AC, 2024 WL 4225839, at *5 (E.D. Cal. Sept. 18, 2024) (citing Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999); Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996)); see also Parra, 481 F.3d at 750 (upholding the ALJ's finding that the claimant's subjective complaints of pain were contradicted by normal examination findings); Ryan L. v. O'Malley, Case No.: 23-cv-338-DDL, 2024 WL 1283812, at *6 (S.D. Cal. Mar. 26, 2024) (finding that the ALJ properly discounted plaintiff's subjective symptom testimony, where the ALJ found that "the consistently normal findings on physical examination over a period of years rendered [p]laintiff's allegations that he could not sit upright, walk 'down the street,' or use his arms, hands or fingers without pain less than credible.").

In this case, the ALJ cited records showing Plaintiff's progress and improvement after her August 2019 neck surgery, and noted that despite Plaintiff's continuing complaints of pain and weakness, examination notes by multiple providers consistently showed intact 5/5 strength in her upper extremities and a generally normal gait.  (AR at 25–26 (citing id. at 908, 936, 959–60, 994–1002)); see also Macri, 93 F.3d at 544 (noting that the evidence documenting intact limb strength is a specific reason to reject a claimant's subjective pain testimony).  The ALJ also stated that Plaintiff had intact sensation in her upper extremities, and continued to exhibit full motor strength in her extremities through August 2022.  (AR at 26 (citing id. at 362, 908, 936, 959–60, 994–1002).)  Plaintiff's examination findings showing "5/5 motor strength in the bilateral upper and extremities," intact sensation, negative straight leg tests, normal gait, normal

range of motion of all joints, no synovitis,[8] negative rheumatology panel, and normal neurological examination findings with negative Romberg tests,[9] seemed inconsistent with Plaintiff's claims that she could sit for only thirty minutes, stand for ten minutes, and walk for up to fifteen minutes at a time, could not lift over one pound, had difficulty using her hands, and experienced frequent migraines.  As a result, the ALJ reasonably found that the objective evidence in the record was inconsistent with Plaintiff's allegations of extreme limitations.  See Scianna v. Saul, 839 F. App'x 135, 135 (9th Cir. 2021) (finding that an inconsistency with objective evidence can form a basis for rejecting a claimant's allegations) (quoting Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.")).

The ALJ therefore identified which of Plaintiff's subjective symptom complaints he discounted, cited numerous examination findings which were within the norm, and property concluded that the findings demonstrated greater functionality than Plaintiff alleged.  Accordingly, the ALJ provided a clear and convicting reason, supported by substantial evidence in the record, to discount Plaintiff's symptom testimony.  See Smartt, 53 F.4th at 498; Parra, 481 F.3d at 750.

///

///

///

---

[8] "Synovitis" is "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis."  Kitchen v. Kijakazi, 82 F.4th 732, 736 (9th Cir.  2023) (citation omitted).

[9] A Romberg test is a neurological examination that tests for balance issues.  Delu v. Comm'r of Soc. Sec. Admin., No. CV-21-01849-PHX-DLR, 2023 WL 6890300, at *3 (D. Ariz. Oct. 19, 2023).  The test includes standing unassisted with feet together with eyes open for thirty seconds and then eyes closed for thirty seconds.  Anthony M. v. O'Malley, Case No. CV 23-07694-AS, 2024 WL 3469036, at *4 n.5 (C.D. Cal. June 11, 2024) (citation omitted).  A negative result indicates that the patient did not lose balance during the procedure.  Id.

24cv180-LR

**F.    Conclusion**

The Court finds that the ALJ properly identified which of Plaintiff's statements regarding her symptoms he discounted.  The Court further finds that although one reason the ALJ provided to discount Plaintiff's symptom testimony was not supported by substantial evidence, the ALJ provided two additional clear and convincing reasons, supported by substantial evidence in the record, to discount Plaintiff's subjective symptom testimony.

## VI.  CONCLUSION AND ORDER

For the reasons stated above, the final decision of the Commissioner is **AFFIRMED**.  This Order concludes the litigation in this matter.  The Clerk is directed to issue a judgment affirming the decision of the Commissioner and close this case.

**IT IS SO ORDERED.**

Dated:  March 12, 2025

_____
Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge